IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL RINALDI,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL NO. 1:CV-13-00450** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **UNITED STATES OF AMERICA,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M

Plaintiff Michael Rinaldi initiated this civil rights action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), by filing a complaint on February 19, 2013 against numerous officers and staff at the United States Penitentiary, Lewisburg (USP-Lewisburg), the facility where he was formerly confined.  (Doc. 1.)  In the complaint, Plaintiff alleges several civil rights violations involving his confinement with a hostile cell-mate, Defendants' refusal to allow him to practice his religion, and USP-Lewisburg's policy regarding psychiatric treatment.  (*Id.* at 5.)  Presently before the court is Defendants' motion to dismiss and/or for summary judgment.  (Doc. 18.)  For the reasons stated below, the motion will be granted.

1

## I.  <u>Background</u>[1]

In January, 2012, approximately two months after arriving at USP-Lewisburg, Plaintiff was told by Defendant Baysore that if he did not stop filing administrative remedy requests, she would have him moved into a cell with an inmate who was known for assaulting his cell-mates.  (Doc. 1 at 3.)  When Plaintiff reported this to Defendant Kissell (a case manager at USP-Lewisburg), Kissell told him that he was not going to get involved because it was "over his head" and the other officials were tired of Plaintiff filing administrative remedy requests.  (*Id.*)  On February 2, 2012, Defendant Officer Gee informed Plaintiff that he was being moved because he had continued filing administrative remedy requests.  (*Id.*)  When Plaintiff refused to cooperate, Gee threatened to call a team of officers and have Plaintiff gassed and placed in restraints.  (*Id.*)  Plaintiff was then moved into a cell with an inmate who had told prison officials that he would kill Plaintiff.  (*Id.*)

Over the next few weeks, Plaintiff had several physical altercations with his cell-mate that left him with cuts and bruises.  (*Id.*)  The cell in which he was placed was also dirty and had a toilet stained from urine and feces.  (*Id.*)  When Plaintiff

---

[1] Because Defendants move for dismissal primarily under Rule 12(b)(6), this court will recite the factual background of the case as set forth by Plaintiff.  *See, e.g.*, *Brown v. Card Service Center*, 464 F.3d 450, 452 (3d Cir. 2006) (stating that under Rule 12(b)(6), a court must "accept all well-pled allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.")

complained of this, the staff refused to do anything and provided him with no cleaning supplies aside from a small amount of disinfectant. (*Id.* at 3–4.) Prison officials also turned off the prison's heating system just before the temperature dropped below freezing. (*Id.* at 4.) When Plaintiff complained of this, he was told that the building was "too old" to turn the heat back on and was refused any blankets to keep warm. (*Id.*) Plaintiff contracted a cold as a result of the temperature drop. (*Id.*)

While at USP-Lewisburg, Defendants Packard, Tanner, and Bingaman (prison officers) ridiculed Plaintiff and called him a "rat" or "snitch" because he had filed administrative remedy requests. (*Id.*) They denied Plaintiff his recreation period on multiple occasions due to issues such as having milk cartons out in his cell or having a clothesline hanging up. (*Id.*) Plaintiff was denied the opportunity to attend Friday prayers in congregation, which is required by his religion. (*Id.*) Defendant Officer Shivery also stole Plaintiff's personal property during a search of his cell; when Plaintiff requested a confiscation sheet showing the items that were taken, his request was denied. (*Id.*)

Plaintiff suffered emotional distress from these events and requested a psychological review with the prison's psychologist, Defendant Dr. Mink. (*Id.*) Plaintiff was then informed that the review would have to be conducted through

3

the cell door within hearing range of other nearby inmates.  (*Id.*)  Because of this,

Plaintiff was unable to confidentially express his emotional distress and other

psychological issues to Dr. Mink.  (*Id.*)

Plaintiff filed an administrative remedy request regarding these issues, but it

was not "appropriately investigated or responded to."  (*Id.*)  Plaintiff also appealed

this request to the General Counsel of the Federal Bureau of Prisons, but this was

"not adequately investigated" and was not responded to.  (*Id.*)  Plaintiff claims that

numerous staff, including the warden and associate wardens, of USP-Lewisburg

"make light of the administrative remedy situation and refer to it as a joke."  (*Id.*)

He further alleges that staff members "acknowledge that all they have to do is stick

together and lie for each other and they can get away with whatever they want."

(*Id.* at 5.)

Plaintiff filed the instant complaint on February 19, 2013.  (Doc. 1.)

Defendants filed a motion to dismiss and/or for summary judgment on May 28,

2013.  Plaintiff later filed a brief in opposition to this motion (Doc. 30), and

Defendants filed a reply brief (Doc. 36).  The motion is thus now ripe for

disposition.

4

## II.    Legal Standard

### A.    Motion to Dismiss—Lack of Jurisdiction

Federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constution and statute." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  A party may challenge whether a district court has subject matter jurisdiction to hear a given claim through a motion to dismiss under Rule 12(b)(1).  A court may treat a Rule 12(b)(1) motion as either a facial or factual challenge to jurisdiction.  *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  In reviewing a facial attack, the court must accept all of the allegations in the complaint as true, whereas when reviewing a factual attack the court has no obligation to accept the truth of these allegations and may base its decision on information not contained in the complaint.  *Id.*; *see also Gould Elecs. v. United States*, 220 F.3d 169, 176–77 (3d Cir. 2000).  As subject matter jurisdiction is a fundamental prerequisite for any judicial action, the court cannot consider the merits of a claim without first determining that it has jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

### B.    Motion to Dismiss—Failure to State a Claim

The Federal Rules of Civil Procedure require that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Fair notice" in the context of Rule 8 "depends on the type of case—some complaints will require at least some factual allegations to make out a 'showing that the pleader is entitled to relief.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (quotation omitted).  A plaintiff must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) (recognizing that Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"); *see also Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (stating that the court is not "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation.") (quotations omitted).

A defendant may attack a complaint by a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  In deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint and all reasonable inferences permitted by

the factual allegations, and view them in the light most favorable to the plaintiff. *Watson v. Abington Twp.*, 478 F.3d 144, 150 (3d Cir. 2007); *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007).  If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss.  *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 555, 570) (explaining a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *see also Phillips*, 515 F.3d at 234; *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007); *Stevenson v. Carroll*, 495 F.3d 62, 66 (3d Cir. 2007).  When a complaint contains well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 664.  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.*

When presented with a pro se complaint, the court should construe the complaint liberally and draw fair inferences from what is not alleged as well as from what is alleged. *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003);

7

*Youse v. Carlucci*, 867 F. Supp. 317, 318 (E.D. Pa. 1994). Such a complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Finally, in the Third Circuit, a court must grant leave to amend before dismissing a civil rights complaint that is merely deficient. *See, e.g.*, *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

## C.    Summary Judgment

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

8

2011).  Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning there is sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011); *see also S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013).

A party moving for summary judgment has the initial burden of supporting its assertion that the material facts are not genuinely disputed by citing to particular parts of materials in the record—i.e., depositions, documents, affidavits, stipulations, or other materials— or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its factual allegations.   Fed. R. Civ. P. 56(c)(1).  The moving party may discharge its burden by "pointing out to the district court" the "absence of evidence to support the nonmoving party's case" when the nonmoving party bears the ultimate burden of proof for the claim in question.  *Conoshenti v. Public Serv. Elec. & Gas Co*, 364 F.3d 135, 140 (3d Cir. 2004) (quoting *Singletary v. Pennsylvania Dept. of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001)).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that at least some facts are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s).  Fed. R. Civ. P. 56(c)(1).  When determining whether there are any genuine issues of material fact, the court "should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  *Lower Merion Sch. Dist.*, 729 F.3d at 256.

In reviewing a motion for summary judgment, the court does not make credibility determinations, and summary judgment is "inappropriate when a case will turn on credibility determinations."  *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 235 (3d Cir. 2007) (quoting *Horowitz v. Federal Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)).

## III.   **Discussion**

In his complaint, Plaintiff sets forth the following claims: 1) the conditions of his confinement at USP-Lewisburg, including being forced to reside with an

inmate who stated that he wanted to kill Plaintiff, constituted cruel and unusual

punishment;

2) Defendants unlawfully retaliated against Plaintiff for filing grievances by

forcing him to reside with an inmate who stated that he wanted to kill Plaintiff; 3)

Defendants violated his Fifth and Eighth Amendment rights by denying him access

to adequate recreation; 4) the denial of Plaintiff's ability to worship in

congregation violated his right to religious freedom; and 5) the requirement to have

psychological review conducted through the cell door resulted in Plaintiff being

denied proper medical care and violated his right to confidentiality with his doctor.

(Doc. 1 at 3, 5.)  Defendants raise the following grounds for dismissal and/or

summary judgment: 1) Plaintiff failed to exhaust his administrative remedies for

the claims regarding the conditions of his confinement, retaliation, and the denial

of his ability to worship in congregation; 2) The doctrine of sovereign immunity

renders this court without jurisdiction to hear claims against the United States and

the individual defendants in their official capacities; 3) Plaintiff failed to

adequately establish his claim of retaliation; 4) Plaintiff's claims should be

dismissed as to Defendants Kissell, Baysore, and Gee because the threats they

allegedly made do not amount to a constitutional violation; 5) The denial of

Plaintiff's recreation time does not rise to the level of an Eighth Amendment

violation; 6) Plaintiff's claim that Defendant Shivery stole his personal property is factually unsupported; 7) Plaintiff's claim regarding his psychological treatment by Defendant Mink does not rise to the level of an Eighth Amendment violation; 8) The claims against Defendants Norwood, Thomas, Gondolosky, Young, Bahre, and Taggert should be dismissed because Plaintiff does not allege any direct involvement by them in his claims; 9) Plaintiff has failed to show that he was denied the free practice of his religion; 10) Summary judgment should be granted to the United States because Plaintiff's injuries are not compensable under the Federal Tort Claims Act; and 11) The prison official defendants are entitled to qualified immunity.  (Doc. 24 at 5–6.)  The court will first address the question of jurisdiction before turning to the other grounds for dismissal.

## A.    <u>Lack of Jurisdiction—Sovereign Immunity</u>

Defendants argue that, insofar as Plaintiff asserts his claims against the United States and individual Defendants in their official capacity, this court lacks jurisdiction to hear those claims because of the doctrine of sovereign immunity.  It is well established that "the United States, as sovereign, 'is immune from suit save as it consents to be sued.'"  *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 31 U.S. 584, 586 (1941)).  Sovereign

immunity applies in the same manner to prevent suits against individual defendants in their official capacity. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985).

Plaintiff does not explicitly respond to this argument to indicate what authority he relies on to show that the United States has waived immunity for this suit. (*See* Doc. 31.)  However, this court notes that Plaintiff cited the Federal Tort Claims Act ("FTCA") as one of the jurisdictional authorities for his complaint. (Doc. No. 1 at 2.)  The FTCA, in relevant part, states:

> Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  In order for a court to exercise jurisdiction under the FTCA, the plaintiff must first have "presented the claim to the appropriate Federal agency" and the agency must have issued a final denial of the claim within six months before the filing of the FTCA action.  28 U.S.C. § 2675(a).  On May 26, 2012, Plaintiff filed an administrative tort claim complaining about being forced to live with an inmate who threatened to kill him and subsequently being assaulted. (Doc. 26-1 at 4.)  This claim was denied on November 28, 2012.  (*Id.* at 6.)  There

is no record of any other administrative tort claims filed by Plaintiff related to his incarceration at USP-Lewisburg.  (*See* Doc. 25 at 6.)

Aside from this exhaustion requirement, the claim asserted must also be such that a private person could be held liable for it.  28 U.S.C. § 1346(b)(1); *see also United States v. Olson*, 546 U.S. 43 (2005).  In the instant complaint, Plaintiff asserts that Defendants violated his Eighth Amendment rights by forcing him to reside in a cell with an inmate who threatened to kill him.  (Doc. 1 at 5.)  Setting aside Plaintiff's invocation of the Eighth Amendment, the substance of his claim appears to be that he suffered injuries because Defendants forced him to reside with an inmate that they knew, or should have known, had expressed an intention to kill Plaintiff.  (*Id.* at 3-4.)  This is essentially a negligence action against Defendants, which is allowed under the FTCA.  *See United States v. Muniz*, 374 U.S. 150 (1963).

However, the FTCA provides an exception to this waiver of immunity for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The applicability of this "discretionary function exception" is determined by a two-part inquiry:

14

First, a court must determine whether the act involves an element of judgment or choice. The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. Second, even if the challenged conduct involves an element of judgment, the court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Mitchell v. United States*, 225 F.3d 361, 363–64 (3d Cir. 2000) (internal citations and punctuation omitted).  The challenged conduct in this case, assigning Plaintiff to a cell and determining how best to protect him, is unquestionably covered by this exception.  While prison officials have a statutory duty to provide for the safekeeping of inmates, 18 U.S.C. § 4042, the statute leaves the implementation of that duty up to the discretion of prison officials.  *See, e.g.*, *Donaldson v. United States*, 284 F. App'x 75, 77 (4th Cir. 2008).  Furthermore, "how best to protect one inmate from the threat of attack by another" is the kind of conduct "that the discretionary function exception was designed to shield."  *Id.* (quoting *Mitchell*, 225 F.3d at 363); *see also, e.g.*, *Rinaldi v. United States*, 460 F. App'x 80 (3d Cir. 2012).

Because the conduct challenged in this case falls within the discretionary function exception to the FTCA's waiver of sovereign immunity, this court lacks jurisdiction over Plaintiff's claims against the United States and all other

15

Defendants in their official capacity.  Thus, this court will dismiss all claims

against the United States and all other Defendants in their official capacity.

## B.   Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), prisoners who

wish to bring a civil action alleging that prison conditions violate federal law  must

first exhaust all available administrative remedies.  42 U.S.C. § 1997e.  This

requirement is mandatory and not left to the discretion of the district court.

*Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731,

734 (2001)).  Prisoners must exhaust all available remedies with respect to each

claim even when those remedies cannot grant the relief the prisoner seeks.  *Id.*

Exhaustion in this context means "proper" exhaustion, which requires the

completion of all steps in the administrative relief process and compliance with all

procedural requirements.  *Id.* at 91.  This exhaustion requirement is not

jurisdictional, but operates instead as an affirmative defense that must be proved by

the defendants.  *Ray v. Kertes*, 285 F.3d 287, 291–92 (3d Cir. 2002) (internal

citation omitted).  A party can only obtain summary judgment on the ground of an

affirmative defense by supporting their motion with evidence "that would entitle

[it] to a directed verdict if not controverted at trial."  *In re Bressman*, 327 F.3d 229,

237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)

(Brennan, J., dissenting)).  Once the moving party makes this showing, "it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *Id.*

The Federal Bureau of Prisons ("BOP") maintains a four-step procedure for the resolution of inmate complaints.  *See* 28 C.F.R. §§ 542.10–542.19.  This procedure requires that an inmate must generally first attempt an "informal resolution" with the prison staff according to procedures established by the warden of the prison.  *Id.* at § 542.13.  If that is unsuccessful, the inmate must then file a formal administrative remedy request with the local staff member designated to receive such requests within 20 days of the occurrence that is the basis of the complaint.  *Id.* at § 542.14.  The request will then be reviewed and, if filed according to the procedural requirements, will be formally responded to by the Warden.  *Id.*  If the response is unfavorable, the inmate must appeal the decision to the BOP Regional Director within 20 days of the date the Warden signed the response.  *Id.* at § 542.15.  If the response to the appeal is unfavorable, the inmate must then file an appeal to the BOP General Counsel within 30 days of the date the Regional Director signed the response.  *Id.*  After this last stage, an inmate has

exhausted his available administrative remedies. *Id.* at § 542.15(a) ("Appeal to the General Counsel is the final administrative appeal.")

Defendants concede that Plaintiff exhausted his administrative remedies with respect to his claims of being denied recreation, not receiving adequate psychological reviews, and having his property stolen during a cell search by Defendant Shivery. (Doc. 24 at 11.) Defendants contend, however, that Plaintiff's other claims regarding his conditions of confinement, retaliation, and the restriction of his religious exercise remain unexhausted. Plaintiff disputes this, stating that he exhausted his administrative remedies with respect to each claim in the complaint. (Doc. 31 at 2.) The record of Plaintiff's administrative remedy requests for each claim will be examined in turn.

### i. Claims Related to Forced Residence with Hostile Inmate

Plaintiff contends that he exhausted his claims of being assaulted by his cell-mate by appealing administrative remedy request number 675165 to the BOP General Counsel. (*Id.*) That request is dated February 1, 2012, the day before Plaintiff was unexpectedly moved in with the cell-mate who had threatened to kill him. (Doc. 36-1 at 11.) In that request, Plaintiff complains of being assaulted by a different cell-mate, and requests that USP-Lewisburg cease forcing inmates to cell together regardless of their compatibility. (*Id.*) Plaintiff filed an appeal after this

18

request was denied, in which he raised the issue that he was now being forced to reside with a cell-mate who had threatened to kill him.  (*Id.* at 14.)  However, the BOP's Administrative Remedy Program regulations specifically prohibit an inmate from raising issues for the first time on appeal.  28 C.F.R. § 542.15(b)(2).  By raising this issue for the first time on appeal, Plaintiff did not comply with the procedural requirements of the BOP's Administrative Remedy Program and thus did not exhaust his administrative remedies for this claim.

Plaintiff also asserts that he exhausted this claim by filing request number 684006 directly with the Regional Director, pursuant to the regulations allowing inmates to file their initial request with the Regional Director when it pertains to a "sensitive issue."  (Doc. 31 at 2; 28 C.F.R. § 542.14(d)(1).)  However, the record indicates that the Regional Director rejected this claim.[2]  (Doc. 36-1 at 21.)  When a sensitive claim is rejected, the inmate is directed to file the request locally for review by the Warden.  28 C.F.R. § 542.14(d)(1).  Instead of refiling this request locally, Plaintiff claims he appealed the rejection to the General Counsel, though there is no record of this appeal being received.  (Doc. 31 at 2; Doc. 36-1 at 34.)  Plaintiff claims that the General Counsel's failure to respond constituted a denial of

---

[2] The relevant BOP regulations distinguish between the terms "rejected," which indicates a refusal to accept the filing due to a procedural defect, and "denied," which indicates an acceptance of the filing for review but a denial of the relief requested. *See* 28 C.F.R. § 542.14.

the substance of his request, thus exhausting his administrative remedies on this

claim.  (Doc. 31 at 2.)  This method of denial by default, however, only applies

after a request has been accepted for filing, and Plaintiff's request was never

accepted.  28 C.F.R. § 542.18.  Even assuming that Plaintiff filed an appeal to the

General Counsel, the General Counsel would still have had to affirmatively accept

the filing in order to trigger the provision that deems a failure to respond a denial.

*See* 28 C.F.R. §§ 542.17(c), 542.18.  Because this request was not properly filed

and appealed through each level of the process, Plaintiff failed to exhaust his

claims regarding being forced to reside with a cell-mate who threatened to kill him.


Thus, both Plaintiff's retaliation claim and his conditions of confinement

claim regarding this forced residence with a hostile inmate must be dismissed for

failure to exhaust administrative remedies.

### ii. Conditions of Confinement—Overcrowding and Understaffing

Plaintiff next contends that he exhausted his claim regarding overcrowded

conditions in USP-Lewisburg by filing and appealing request number 699223.

(Doc. 31 at 2.)  In this request, Plaintiff complained that the overcrowded

conditions in the prison contributed to physical altercations between inmates and

requested to be moved to the Residential Reentry Center or put into house arrest.

20

(Doc. 36-1 at 38.)  Plaintiff's request was denied, and the record shows he exhausted the available appeals for this request.  (*Id.* at 41.)  Defendants reply that the appeal of this request did not exhaust Plaintiff's remedies for any of his claims because it did not raise any of the specific overcrowding issues that Plaintiff raises in the instant complaint and because none of the individual Defendants were identified in the request.  (Doc. 36 at 7.)

Defendants do not cite any authority to support their assertion that Plaintiff needed to name Defendants in his request forms in order to exhaust his administrative remedies, and there appears to be no such authority in this circuit. The Third Circuit has held that prisoners must name defendants in their administrative remedy requests where the identity of the defendant is a "fact relevant to the claim"—but this holding was based on a procedural requirement of Pennsylvania's prison grievance system.  *Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004).  The BOP's Administrative Remedy Program does not place such requirements on the substance of an inmate's request, and instead only require that the inmate "place a single complaint or a reasonable number of closely related issues on the form."  *See* 28 C.F.R. § 542.14(c)(2).  Even if there were such a requirement, it is unclear how the identity of any individual Defendant would be relevant to a claim regarding overcrowded conditions.

21

Furthermore, the issue raised in this request is substantially similar to one of the issues raised as part of Plaintiff's instant Eighth Amendment claim.  In the request, Plaintiff complained that "[p]rison overcrowding and understaffing increases the incidence of assaults" at USP-Lewisburg.  (Doc. 36-1 at 38.)  In the instant complaint, Plaintiff claims, in part, that "[o]vercrowding, understaffing and the totality of the circumstances violated" his Eighth Amendment rights.  (Doc. 1 at 5.)  Defendants argue that this administrative remedy request actually concerned whether Plaintiff should be placed in the Residential Reentry Center (Doc. 36 at 7), but that was clearly Plaintiff's requested relief, not the central problem for which he was trying to obtain relief.  There is no requirement that plaintiffs must seek the same remedy through administrative channels as they do in a civil rights lawsuit, only that they present the same claim.  *See Booth*, 532 U.S. at 741 n.6 (holding that the PLRA requires an inmate to exhaust remedies "irrespective of the forms of relief sought and offered through administrative avenues").

Thus, the record shows that Plaintiff has exhausted his conditions of confinement claim regarding the overcrowded and understaffed conditions at USP-Lewisburg.

### iii. Conditions of Confinement—Cell Temperature

22

Plaintiff next contends that he exhausted his administrative remedies for his claim that the cells at USP-Lewisburg had inadequate temperature controls through administrative remedy request number 688567. (Doc. 31 at 3.) The BOP's database states that this request concerned the fact that Plaintiff's housing unit was cold and that he only had a t-shirt to keep warm, and that this request was appealed through each level of the process. (Doc. 36-2 at 2–6.) Defendants argue that this request was inadequate for exhaustion purposes because it "did not identify any of the individual Defendants and [the] Complaint fails to demonstrate how any named Defendant had any personal involvement in the acts complained of in the remedy request."

As already mentioned above, there is no general requirement that inmates must name individual defendants in an administrative remedy request in order to exhaust their administrative remedies for a claim. (*See supra* Part III.B.ii.) The relevant claim in the instant complaint is that the inadequate temperature controls, combined with inadequate clothing, constituted inhumane conditions of confinement at USP-Lewisburg. (Doc. 1 at 4–5.) Defendants offer no reason to conclude that the identity of particular defendants is so integral to this claim as to be a requisite component of the administrative remedy request.

Thus, the record indicates that Plaintiff exhausted his administrative remedies for the issue of inadequate temperature controls for his conditions of confinement claim.

### iv. Conditions of Confinement—Denial of Cleaning Products

Plaintiff next contends that he exhausted his claim regarding the denial of adequate supplies to clean and/or sanitize his cell through request number 693008. (Doc. 31 at 3.)  This request, which was appealed through each step of the process, complained of the fact that inmates were only given disinfectant once a week to clean their cells, and were not given any brushes or other supplies with which to clean.  (Doc. 36-2 at 20–29.)  Defendants argue again that this request did not exhaust the claim because it did not identify any individual Defendants and because neither the request nor the Complaint explain how Defendants are involved with this issue.  (Doc. 36 at 11–12.)  Defendants again offer no explanation for why the identity of individual defendants is so integral to this issue as to be a necessary component of the remedy request.  (*See supra* Part III.B.ii.)

Thus, the record reflects that Plaintiff has exhausted his administrative remedies for the issue of the denial of cleaning supplies for his conditions of confinement claim.

### v. Free Exercise of Religion

24

Plaintiff next contends that he exhausted his administrative remedies for his free exercise of religion claim through administrative remedy request number 693008.  (Doc. No. 31 at 3.)  The record shows that this request concerned Plaintiff's desire to offer "Friday (Jumuah)[3] prayers in congregation" with other Muslims and that this request was appealed through each level of the process. (Doc. 36-2 at 8–19.)  Defendants concede that, to the extent that this claim "only pertains to the ability for him to participate in a congregational Friday Jumah prayer with other Muslim inmates, this claim is exhausted," but argue that this request did not exhaust any claim of "a general denial of his ability . . . to practice his Muslim faith."  (Doc. 36 at 10.)

In the instant complaint, Plaintiff claims that he was "denied the opportunity to freely practice his religion when he was not afforded the opportunity to offer Friday prayer in Congregation."  (Doc. 1 at 5.)  Plaintiff clearly states that he believes his religion requires him to "attend Friday prayers in Congregation."  (*Id.* at 4.)  Defendants' attempt to distinguish between a denial of Plaintiff's ability to exercise his faith and a denial of his ability to participate in a congregational Jumuah prayer are unavailing, as Plaintiff is clearly claiming that attending Jumuah

---

[3] This word is alternatively spelled "Jumuah" and "Jumah" in the briefs submitted by Plaintiff and Defendants.  (*See, e.g.*, Doc. 31 at 4; Doc. 36 at 9.)  This court will use the spelling "Jumuah" except where directly quoting other material.

prayer in congregation is an essential component of his religion.  *See Garraway v. Lappin*, 490 F. App'x 440 (3d Cir. 2012) (analyzing a similar claim regarding attending the Jumuah prayer in congregation as a free exercise claim).  It is irrelevant that Plaintiff did not claim in his administrative remedy request that his ability to practice his religion was being hampered in other ways, as he is not attempting to raise such claims in his complaint.

Thus, Plaintiff has exhausted his administrative remedies for his claim that Defendants denied him the ability to exercise his religion.

### vi. Inadequate Investigation of Administrative Remedy Requests

Plaintiff finally contends that he exhausted his claim that prison officials "failed to adequately investigate his complaints" and that "the administrative remedy procedure is inadequate" through request number 699129.  (Doc. 31 at 3.) Prison inmates have no right to an administrative procedure for handling grievances and thus the mishandling of administrative remedy requests is not cognizable as a freestanding claim.  *See, e.g.*, *Heleva v. Kramer*, 214 F. App'x 244, 247 (3d Cir. 2007) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001)). Because this is not a legally cognizable claim, this court finds it unnecessary to examine the issue of whether Plaintiff exhausted his administrative remedies for this issue and will dismiss the claim.

26

### C.   **Failure to State a Claim—Denial of Recreation**

Plaintiff alleges that on "numerous occasions," Defendants Packard, Tanner, and Bingaman denied him recreation time "for having milk cartons in his room or a clothing line hanging up." (Doc. 1 at 4.)  Plaintiff claims that these deprivations denied him due process.  (*Id.* at 5.)  Defendants contend that Plaintiff has failed to state a claim under the Fifth or Eighth[4] Amendment based on the denial of his recreation time.  (Doc. 24 at 17–19.)

The disciplining of inmates by prison officials does not generally impinge upon the Fifth Amendment's Due Process clause unless the action "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  This rule is intended to allow a great deal of discretion for prison officials in the day-to-day management of prisons by setting a high bar for the sorts of disciplinary actions that must be accompanied by due process.  *See id.* at 482 (explaining that an older approach "led to the involvement of federal courts in the day-to-day management of prisons" and ran "counter to the view . . . that federal courts ought to afford

---

[4] While Plaintiff never mentions the Eighth Amendment with respect to the denial of his recreation time, he does state that the "totality of the circumstances" during his stay at USP-Lewisburg violated his rights under the Eighth Amendment.  (Doc. 1 at 5.)  Thus, this court will construe the complaint liberally to include a claim that the denial of Plaintiff's recreation time constituted an inhumane condition of confinement under the Eighth Amendment.

appropriate deference and flexibility to state officials trying to manage a volatile

environment."). The disciplinary actions that Plaintiff complains of, even if true,

do not meet this high standard. *See, e.g.*, *Smith v. Mensinger*, 293 F.3d 641, 654

(3d Cir. 2002) ("[T]he sanction [Plaintiff] challenges (seven months disciplinary

confinement) does not, on its own, violate a protected liberty interest as defined in

*Sandin*."); *Young v. Beard*, 227 F. App'x 138 (3d Cir. 2007) (holding that an

inmate who had been placed in disciplinary confinement for 930 days was not

entitled to procedural guarantees of the Due Process clause). Therefore, Plaintiff's

allegations regarding the denial of his recreation time fail to state a claim under the

Fifth Amendment.

Defendants also argue that Plaintiff failed to state a claim under the Eighth

Amendment with regard to these allegations. (Doc. 24 at 17–19.) In order to state

a claim of inhumane prison conditions under the Eighth Amendment, a plaintiff

must allege that prison officials acted with "deliberate indifference" to the health or

safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations

omitted). This requires that a plaintiff satisfy "both an objective ('Was the

deprivation sufficiently serious') and a subjective ('Did the officials act with a

sufficiently culpable state of mind?') test." *Allah v. Bartkowski*, 574 F. App'x 135,

138 (3d Cir. 2014). To satisfy the objective component of the test, a plaintiff must

28

show that the conditions of the prison deprived him or her of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise."). To satisfy the subjective component of the test, the plaintiff must show that the prison official both knew of and disregarded those conditions. *Farmer*, 511 U.S. at 837.

Plaintiff's claim that he was unfairly denied recreation time cannot meet either component of this test. First, Plaintiff does not offer an estimation of how many times he was denied recreation, whether these denials were for a lengthy, continuous period of time, nor even whether he suffered any harm as a result of these denials. "While the denial of exercise and recreation may result in a constitutional violation, a temporary denial is insufficiently serious to implicate the Eighth Amendment." *Millhouse v. Arbasak*, 373 F. App'x 135, 138 (3d Cir. 2010) (citing *Knight v. Armontrout*, 878 F.2d 1093, 1096 (8th Cir. 1989) (holding that denial of recreation for thirteen days did not violate the Eighth Amendment)). As for the subjective component of the test, Plaintiff alleges that Defendants denied

his recreation time because he had left milk cartons in his cell and/or items of

clothing hanging to dry.  (Doc. 1 at 4.)  In the absence of any reason to believe that

this temporary denial of recreation threatened to cause Plaintiff serious harm, this

falls short of alleging the requisite mental state—one of deliberate indifference to a

substantial risk of serious harm—for an Eighth Amendment Claim.  *See Farmer*,

511 U.S. at 837.

Thus, Plaintiff's allegations with regard to being denied recreation time fail

to state a claim under either the Fifth or Eighth Amendments and will be dismissed.

### D. <u>Failure to State a Claim—Search of Cell and Seizure of Property</u>

Plaintiff alleges that Defendant Shivery conducted a search of his cell and

"stole his personal property and commissary items."  (Doc. 1 at 4.)  Defendants

contend that Plaintiff has failed to state a claim on this matter or, in the alternative,

that they should be awarded summary judgment as to this claim because the record

does not support that the alleged search took place.  (Doc. 24 at 19–20.)  Even

accepting Plaintiff's allegations as true, Plaintiff's right to Due Process was not

violated by the intentional theft or destruction of his property so long as a

"meaningful postdeprivation remedy" was available.  *Hudson v. Palmer*, 468 U.S.

517, 533 (1984).  The Third Circuit has deemed the BOP's Administrative Remedy

Program to be a meaningful post-deprivation remedy in these circumstances, and

whether the program yielded favorable results for Plaintiff is irrelevant to the

question of whether it was a meaningful remedy.  *See, e.g.*, *Toney v. Sassaman*,

588 F. App'x 108, 110 (3d Cir. 2015) (finding that plaintiff had "adequate post-

deprivation remedies" where Plaintiff's efforts at obtaining compensation through

the BOP's Administrative Remedies Program were unsuccessful).

Thus, Plaintiff's allegations that his property was stolen by Defendant

Shivery fail to state a claim under the Fifth Amendment and will be dismissed.

### E.    <u>Failure to State a Claim—Inadequate Psychological Treatment</u>

Plaintiff claims that when he requested a psychological review from prison

officials he was told that "the review had to be done through the cell door in front

of his cellmate and within earshot of the other inmates."  (Doc. 1 at 4.)  Because of

this, Plaintiff states he was "unable to confidentially express his emotional distress

and other psychological issues."  (*Id.*)  Similarly, when Plaintiff requested a "one

on one" psychological session with Defendant Dr. Mink he was told that, due to

the overcrowded and understaffed conditions at the prison, he would have to

"receive treatment through the cell door or no treatment at all."  (*Id.*)  Plaintiff

claims that these events denied him "proper psychological care" and that his

"doctor/patient confidentiality rights" were also violated.  (*Id.* at 5.)  Defendants

contend that Plaintiff has failed to state a claim with regard to these allegations, or,

in the alternative, that the treatment provided to Plaintiff was constitutionally

adequate.  (Doc. 24 at 21–23.)

The Eighth Amendment requires that prisons provide adequate medical care

to inmates.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This requirement extends

to the treatment of psychiatric as well as physical ailments.  *Inmates of Allegheny*

*County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979).  In order to state a claim

that prison officials rendered inadequate medical care in violation of the Eighth

Amendment, a plaintiff must allege facts demonstrating that the officials in

question acted with deliberate indifference to a serious medical need.  In this

context, deliberate indifference is more than an "inadvertent failure to provide

adequate medical care," and requires "obduracy and wantonness . . . which has

been likened to conduct that includes recklessness or a conscious disregard of a

serious risk."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (internal

quotations omitted).  Prisoners also unquestionably maintain a right to privacy in

their medical information, albeit not to the same extent as free citizens.  *Doe v.*

*Delie*, 257 F.3d 309, 317 (3d Cir. 2001).  An inmate's right to privacy regarding

their medical information may be "curtailed by a policy or regulation that is shown

to be 'reasonably related to legitimate penological interests.'"  *Id.* (quoting *Turner*

*v. Safley*, 482 U.S. 78, 89 (1987)).  Furthermore, not every disclosure of medical

information is so serious as to rise to the level of a violation of an inmate's

constitutional right to privacy.  *See Allah v. Hayman*, 442 F. App'x 632, 636 (3d

Cir. 2011) (expressing doubt that conducting a tuberculosis skin test in front of

other inmates would violate an inmate's privacy rights).

To the extent Plaintiff attempts to state a free-standing claim of a violation

of his right to privacy in his medical records, this attempt fails.  Plaintiff alleges no

facts to indicate that his confidential medical information was in fact disclosed to

others against his will.  To the contrary, Plaintiff asserts that he was unable to

express his psychological issues to Defendant Mink and that he did not participate

in any psychological review that was offered to him through his cell door.  (*See*

Doc. 1 at 4; Doc. 31 at 3.)  As Plaintiff has not alleged that any Defendant actually

disclosed his medical information without his authorization, he fails to state a

claim of violation of his right to privacy.  *See Allah*, 442 F. App'x at 636 (holding

that plaintiff failed to state privacy claim where plaintiff refused to participate in

tuberculosis tests conducted in front of other inmates).

Plaintiff's Eighth Amendment claim for inadequate medical treatment also

fails because he does not allege that any physical injury resulted from the failure to

provide adequate psychiatric treatment.  A prisoner may not bring a civil action

under federal law "for mental or emotional injury suffered while in custody

33

without a prior showing of physical injury." 42 U.S.C. § 1997e(e).  The alleged

physical injury must be more than a *de minimis* injury but need not rise to the level

of a significant injury.  *Mitchell v. Horn*, 318 F.3d 523, 535–36 (3d Cir. 2003).  In

the instant complaint, Plaintiff only alleges that he was unable to express his

"emotional distress and other psychological issues," but does not claim that any

physical injury followed from this.  (*See* Doc. 1 at 4.)

Thus, Plaintiff's allegations regarding the lack of adequate psychiatric

treatment at USP-Lewisburg fail to state a claim for which relief can be granted

and will be dismissed.

### F.    Summary Judgment—Free Exercise of Religion

Plaintiff claims that he was denied his right to exercise his religion when

prison officials denied him the opportunity to attend the Friday Jumuah prayer

service in congregation with his fellow Muslim inmates.  (Doc. 1 at 4, 5.)  Plaintiff

claims that this violated his rights under the First Amendment and the Religious

Freedom Restoration Act.  (Doc. 31 at 4.)

### i. First Amendment Right to Free Exercise of Religion

In order to determine whether a prison regulation that impinges on an

inmate's ability to practice his or her  religion violates the First Amendment, a

court must examine the following four factors: (1) whether there is a valid, rational

34

connection between the prison regulation and the government's legitimate

penological interests; (2) whether the inmate is afforded an alternative means of

practicing their religion; (3) the impact that accommodating the inmate's religious

needs would have on the prison, its staff, and other inmates; and (4) the availability

of alternative forms of regulation that could accommodate the prisoner's rights at

*de minimis* cost to the government's interests.  *Turner*, 482 U.S. at 89–90; *see also*

*DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (quoting *Waterman v. Farmer,* 183

F.3d 208, 213 (3d Cir. 1999)).

It is clear that the *Turner* factors weigh against Plaintiff in this case and that

summary judgment should be awarded to Defendants on this claim.  As for the first

element, Plaintiff is housed in USP-Lewisburg's Special Management Unit (SMU),

a program which is designed to house inmates who "present unique security and

management concerns" and whom the prison officials believe merit "greater

management of their interaction . . . to ensure the safety, security, or orderly

operation" of the prison.  (Doc. 26-1 at 31.)  The conditions in an SMU are similar

to those in Special Housing Units (SHU), and the BOP's program statement on

religious practices explicitly recognizes that inmates confined in an SHU may not

ordinarily congregate for religious services.  (Doc. 26-2 at 26.)  Given that the

SMU is designed as a program for closely managing the interactions of inmates

who have a history of involvement in group or gang-related criminal activity, there is clearly a rational connection between USP-Lewisburg's denial of Plaintiff's ability to observe the Jumuah prayer in congregation and its legitimate interest in maintaining security and order in the prison. *See Garraway v. Lappin*, Civ. No. 4:CV-10-1697, 2012 WL 959422, *9 (M.D. Pa. Mar. 21, 2012) (holding that policies restricting the congregation of general population inmates had a rational connection to the legitimate security concerns of USP-Lewisburg), *aff'd* 490 F. App'x 440 (3d Cir. 2012).

As for the second element, Plaintiff does not dispute that he was afforded the opportunity to practice his religion aside from the single issue of observing the Jumuah prayer in congregation with fellow Muslims. (*See* Doc. 1 at 4–5, Doc. 31 at 3–4.)  Inmates in the SMU at USP-Lewisburg are permitted to request diets that conform to their religious needs, perform daily prayers in their cells, and request religious texts through the prison library. (Doc. 25 at 11–12.)  USP-Lewisburg also alters the meal schedule for Muslim inmates during Ramadan to facilitate their fasting schedule. (*Id.* at 12.)  Plaintiff does not dispute any of these facts, but contends that participating in the Jumuah prayer in congregation is a required aspect of his faith.  However, despite the fact that Plaintiff had no alternative method to observe Jumuah in congregation, the fact that he was capable of

36

observing the other central practices of his religion within the SMU program

causes this element to weigh in favor of Defendants.  *See O'Lone v. Estate of*

*Shabazz*, 482 U.S. 342, 351–52 (1987) ("While we in no way minimize the central

importance of Jumu'ah to respondents . . . . [the] ability on the part of respondents

to participate in other religious observances of their faith supports the conclusion

that the restrictions at issue here were reasonable.").

As for the third element, accommodating the right of inmates in the SMU to

worship in congregation would have a significant impact on prison resources.  As

explained above, the purpose of the SMU is to closely restrict and monitor the

activities and interactions of inmates who have a history of group or gang-related

criminal activity.  (Doc. 26-1 at 31–32.)  Inmates in the SMU are generally

confined to their cells for twenty-three hours per day and offered outside recreation

for a total of five hours per week.  (Doc. 25 at 10; Doc. 26-1 at 35–36.)  In the first

two levels of the SMU program, inmates are only allowed minimal interaction with

each other, and prison officials must determine which inmates may interact with

each other during their limited periods outside of their cells.  (Doc. 26-1 at 38–39.)

After advancing to the third level, inmates may move about and interact with each

other more openly, albeit still under close supervision.  (*Id.* at 39.)  It is only after

attaining the fourth and final level of the SMU program that inmates are allowed to

interact openly and participate in the Jumuah prayer in congregation.  (*Id.* at 40; Doc. 25 at 13.)  This regimented approach to inmate interaction is designed to protect the safety and orderly operation of the prison as well as condition inmates to properly "function in a general population setting with inmates of various group affiliations."  (Doc. 26-1 at 31–32, 40.)  Thus, allowing inmates in the SMU—who may have different or even opposing group affiliations—to congregate in prayer weekly would necessarily have a significant impact on prison resources, as staff would have to be drawn from other duties to closely monitor the services.

As for the fourth element, there are no apparent alternative policies that would provide Plaintiff with the freedom to congregate in the manner he seeks at a *de minimis* cost to the prison.  As explained above, the regulations in question are closely tied to the SMU program's purpose of managing the interactions of inmates that may potentially pose threats to the security and orderly operation of the prison if left in a general population environment.  The freedom that Plaintiff seeks would significantly alter the structure of this program and therefore any alternative would necessarily impose a substantial cost on the prison.

Thus, because a consideration of each of the *Turner* factors weighs in favor of Defendants, summary judgment will be granted in favor of Defendants on this claim.

### ii. Religious Freedom Restoration Act Claim

Under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb

*et seq.*, the federal government may not "substantially burden a person's exercise

of religion" unless it can establish that the burden "is in furtherance of a

compelling governmental interest" and "is the least restrictive means of furthering

that compelling governmental interest."  42 U.S.C. § 2000bb-1.  Plaintiff claims

that Defendants' denial of his ability to observe Jumuah in congregation was an

impermissible burden of his exercise of religion under the RFRA.  (Doc. 1 at 4–5;

Doc. 31 at 3–4).  Defendants contend that this claim should be dismissed because

Plaintiff has not sufficiently alleged that the regulation imposes a "substantial

burden" under the RFRA.  (Doc. 24 at 29.)

For purposes of the RFRA, a "substantial burden" on religious exercise

exists where:

> 1) a follower is forced to choose between following the precepts of his
> religion and forfeiting benefits otherwise generally available to other
> inmates versus abandoning one of the precepts of his religion in order to
> receive a benefit; OR 2) the government puts substantial pressure on an
> adherent to substantially modify his behavior and to violate his beliefs.

*Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007).[5]  Whether the plaintiff is

afforded other means of observing his religion, or whether the religious practice in

question is an absolute commandment, is irrelevant to this inquiry.  *See* 42 U.S.C.

§ 2000cc-5(7)(A) ("The term 'religious exercise' includes any exercise of religion,

whether or not compelled by, or central to, a system of religious belief.")

(incorporated into the RFRA by 42 U.S.C. § 2000bb-2 (4)); *see also Holt v. Hobbs*,

___ U.S. ___, ___, 135 S.Ct. 853, 862 (2015).  Plaintiff claims that observing

Jumuah in congregation with fellow Muslims is "required by his religion" and that

Defendants denied him the opportunity to do so.  (Doc. 1 at 4.)  This clearly

implies that Defendants have placed "substantial pressure" on Plaintiff to modify

his behavior in a way that violates his beliefs.  Keeping in mind that Plaintiff is

proceeding pro se and that his complaint must be read generously, this court finds

that he sufficiently states a substantial burden for the purpose of his RFRA claim.

Furthermore, this court notes that Defendants do not dispute the fact that Plaintiff's

religious beliefs are sincerely held nor that he was unable to attend the Jumuah

prayer in congregation while he resided in the SMU at USP-Lewisburg.  (*See* Doc.

25 at 10–12.)

---

[5] Although *Washington* concerned a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the same test to determine the existence of a "substantial burden" is also applied to RFRA claims.  *See, e.g.*, *Geneva College v. Secretary U.S. Dept. of Health and Human Servs.*, 778 F.3d 422, 442 (3d Cir. 2015).

Although the restrictions on SMU inmates imposed a substantial burden on Plaintiff's exercise of his religion, that burden may still be justified under RFRA if Defendants can show that these restrictions are the least restrictive means of achieving a compelling government interest.  As explained above, the SMU program is designed to closely manage the interactions of inmates with a history of group-related criminal activity in order to maintain the security and orderly operation of the prison.  (*See* Doc. 25 at 10; Doc. 26-1 at 31–42.)  The security and orderly operations of prisons is unquestionably a compelling government interest. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005); *Washington*, 497 F.3d at 283.  In the particular context of this case, it is also clear that the government has a compelling interest in maintaining security over inmates with a history of group or gang-related criminal activity and that the restrictions on congregation for inmates in the SMU furthers this compelling interest.  Yet Defendants offer no evidence to show that this is the *least restrictive* means available to further that interest, nor that they have considered and rejected any other alternative means.  This court does not suggest that Defendants must "refute every conceivable option" in an attempt to show that the policy in question is the least restrictive.  *See Holt*, 135 S.Ct. at 868 (Sotomayor, J., concurring) (citing *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011).  Nonetheless, the

burden lies with Defendants to show that the policy enforced here was the least restrictive means available, and they have offered no evidence whatsoever to satisfy this burden. *See Holt*, 135 S.Ct. at 863. *Washington*, 497 F.3d at 284 ("[T]he phrase 'least restrictive means' . . . . necessarily implies a comparison with other means. Because this burden is placed on the Government, it must be the party to make this comparison.")

Thus, this court finds that Defendants have failed to show that there is no genuine issue of material fact regarding this claim. However, as explained below, this claim will nonetheless be dismissed without prejudice because Plaintiff has failed to allege that any individual Defendants were personally involved in denying him access to congregational prayer.

### G.     Degree of Involvement of Remaining Defendants

Defendants next claim that Plaintiff has failed to allege any personal

involvement on the part of Defendants Bahre,[6] Bledsoe, Gondolosky, Norwood,

Taggert, Thomas, and Young, and thus any remaining claims must be dismissed as

to those defendants.  (Doc. 24 at 23–25.)  Plaintiffs may not rely on theories of

vicarious liability to hold defendants responsible in a civil rights suit, but instead

"must plead that Government-official defendant, through the official's own

individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

"Personal involvement can be shown through allegations of personal direction or

of actual knowledge and acquiescence," but these allegations "must be made with

appropriate particularity."  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.

1988).  This court will now examine the remaining claims in the complaint to

determine whether Plaintiff adequately alleged the personal involvement of any

remaining Defendants.[7]

Three of Plaintiff's remaining claims involve alleged violation of his rights

under the Eighth Amendment due to: 1) the overcrowded and understaffed

---

[6] Defendant Bahre is referred to in the complaint as "Mrs. Rear."  (Doc. 1 at 2.)

[7] This court also notes that Plaintiff's allegation that Defendants "have individually and jointly
conspired together to violate the constitutional rights of Rinaldi and to cover these violations"
(Doc. 1 at 5), is conclusory and cannot form the basis of Plaintiff's claims against each
Defendant.  *See Iqbal*, 556 U.S. at 687–88.

conditions at USP-Lewisburg; 2) the low cell temperatures at USP-Lewisburg

combined with a refusal to provide Plaintiff with warmer clothing than a t-shirt;

and 3) the lack of adequate cleaning supplies.  (Doc. 1 at 4–5.)  Regarding the first

claim, Plaintiff only states that the "overcrowding, understaffing, and the totality of

the circumstances" violated his Eighth Amendment rights.  (*Id.* at 5.)  Nowhere in

the complaint does Plaintiff mention which, if any, of the Defendants was

personally responsible for the overcrowded or understaffed conditions, nor does he

describe how Defendants were otherwise personally involved in the creation of

these conditions.  (*See id.* at 2–3 (describing each individual defendant and their

roles at USP-Lewisburg)).  Plaintiff does state each of the wardens was

"responsible for the operation of [USP-Lewisburg] and for the welfare of all the

inmates housed there" (*Id.* at 2), but this is merely an allegation of managerial

responsibility, and respondeat superior cannot form the basis of liability in a *Bivens*

claim.  *See Iqbal*, 556 U.S. at 676.  Because Plaintiff has failed to allege the

personal involvement of any Defendant in this matter, this claim must be

dismissed.

As for Plaintiff's second conditions of confinement claim, he alleges that

USP-Lewisburg "is inadequately heated and cooled," and when he "complained

about this he was told that the building was constructed in 1932 and is too old to adequately heat and cool." (Doc. 1 at 4.)  Plaintiff also states that

> [f]or approximately a one month period after the heat was turned off, the temperatures dropped below freezing, [Plaintiff] requested the heat be turned back on or he be provided with adequate clothing and these requests were denied.  [Plaintiff] was told that the building was too old to turn the heat back on and the t-shirt and pants he was provided with were adequate.  As a result of these extremely cold temperatures [Plaintiff] suffered from cold, runny nose and severe discomfort.

(*Id.* at 4.)  Plaintiff does not name any Defendant in these allegations and at no point in the complaint does he state that any Defendant was responsible for the heating system at USP-Lewisburg, aside from very general allegations of supervisory responsibilities.  (*See id.* at 2–3.)  Because Plaintiff has failed to allege the personal involvement of any Defendants in this matter, this claim must also be dismissed.

As for Plaintiff's third remaining conditions of confinement claim, he states that during his stay at USP-Lewisburg, "he was not once provided with a broom, mop, toilet brush, scrub brush or cleaning rags.  The only thing ever provided was a small amount of disinfectant." (*Id.* at 4.)  Plaintiff does not allege that any Defendant was personally responsible for the cleaning supplies that he was given, aside from very general allegations of supervisory responsibilities.  (*See id.* at 2–3.)

Because Plaintiff has failed to allege the personal involvement of any Defendants in this matter, this claim must also be dismissed.

The last remaining claim in the complaint is Plaintiff's RFRA claim.  As for that claim, Plaintiff only alleges that he "was denied the opportunity to attend Friday prayers in Congregation as required by his religion," and that he "was denied the opportunity to freely practice his religion when he was not afforded the opportunity to offer Friday prayer in Congregation."  (*Id.* at 4–5.)  At no point in the complaint does Plaintiff allege that any Defendant was personally responsible for the denial of his ability to congregate for Friday prayer, aside from very general allegations of supervisory responsibilities.  (*See id.* at 2–3.)  Because Plaintiff has failed to allege the personal involvement of any Defendants in this matter, this claim must also be dismissed.

## IV.   **Conclusion**

For the reasons given above, all of Plaintiff's claims must be dismissed.[8]  All claims against the United States and Defendants in their official capacity will be dismissed with prejudice for lack of jurisdiction, as any attempt to cure this

---

[8] Because all of Plaintiff's claims will be dismissed on other grounds, this court finds it unnecessary to reach Defendants' arguments concerning whether Plaintiff suffered an injury under the FTCA or whether Defendants are entitled to qualified immunity.  (Doc. 24 at 29–35.)

jurisdictional defect through an amended pleading would be futile.  Plaintiff's

claim regarding the theft of his personal property will also be dismissed with

prejudice, as any attempt at amendment would be futile due to the availability of a

meaningful administrative remedy.  Summary judgment will be granted in favor of

Defendants on Plaintiff's *Bivens* claims regarding being forced to cell with a

hostile inmate, as Plaintiff failed to exhaust his administrative remedies.  Summary

judgment will also be granted in favor of Defendants on Plaintiff's First

Amendment claim of denial of his right to freely exercise his religion.

For the reasons given above, Plaintiff's Eighth Amendment claims regarding

overcrowding, lack of cleaning supplies, low cell temperatures, and inadequate

psychiatric treatment will all be dismissed without prejudice.  Plaintiff's Fifth and

Eighth Amendment claims regarding the denial of recreation time will also be

dismissed without prejudice.  Plaintiff's RFRA claim regarding the denial of his

right to engage in the Jumuah prayer in congregation will also be dismissed

without prejudice.  Plaintiff will be granted thirty (30) days to file an amended

complaint in order to attempt to cure the defects in pleading these claims.  Plaintiff

is advised that any proposed "amended complaint must be complete in all respects.

It must be a new pleading which stands by itself as an adequate complaint without

reference to the complaint already filed." *Young v. Keohane*, 809 F. Supp. 1185, 1198 (M.D. Pa. 1992).

    s/Sylvia H. Rambo     
United States District Judge

Dated:  May 7, 2015.