# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL RINALDI,        :
    **Plaintiff**        :
                      :     **No. 1:13-cv-450**
    **v.**                :
                      :     **(Judge Rambo)**
**UNITED STATES OF**      :
**AMERICA,** *et al.*,       :
    **Defendants**     :

## MEMORANDUM

This matter is before the Court pursuant to the motion for summary judgment (Doc. No. 116) filed by Defendants D. Baysore ("Baysore"), N. Beaver ("Beaver"), Gee, Kissell, and R. Raup ("Raup"). The motion is fully briefed and ripe for disposition.

## I.    BACKGROUND

*Pro se* Plaintiff Michael Rinaldi ("Rinaldi"), who is currently incarcerated at the Lackawanna County Prison in Scranton, Pennsylvania, initiated this civil action on February 19, 2013 by filing a complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA") against numerous officers and staff at the United States Penitentiary Lewisburg ("USP Lewisburg"), where Rinaldi was previously incarcerated. (Doc. No. 1.) In his complaint, Rinaldi alleged several violations involving his confinement with a hostile cellmate, Defendants' refusal to allow him to

practice his religion, and USP Lewisburg's policy regarding psychiatric treatment. (*Id.* at 5.)

Defendants filed a motion to dismiss and/or for summary judgment on May 28, 2013. (Doc. No. 18.) By Memorandum and Order entered on May 7, 2015, the Court granted the motion as follows: (1) all claims against the United States of America were dismissed with prejudice; (2) Rinaldi's Fifth Amendment claim regarding the theft of his property was dismissed with prejudice; (3) Rinaldi's First Amendment claim regarding the denial of free exercise of religion was dismissed; (4) Rinaldi's First and Eighth Amendment claims regarding being forced to reside with a hostile inmate were dismissed; and (5) all other claims were dismissed without prejudice. (Doc. Nos. 42, 43.) Rinaldi was given leave to file an amended complaint within thirty (30) days with respect to the claims dismissed without prejudice. (*Id.*) Rinaldi subsequently filed a motion for reconsideration (Doc. No. 45) and a brief in support of his motion (Doc. No. 46). In a Memorandum and Order entered on December 22, 2015, the Court denied Rinaldi's motion. (Doc. Nos. 52, 53.) Rinaldi subsequently filed a notice of appeal. (Doc. No. 54.)

On September 12, 2018, the United States Court of Appeals for the Third Circuit affirmed in part and vacated and remanded in part this Court's dismissal of Rinaldi's

complaint. *Rinaldi v. United States*, 904 F.3d 257, 262 (2018). Specifically, the Third

Circuit noted that Rinaldi's appeal

> require[d the Court] to resolve three matters of first impression . . . (1)
> what showing an inmate must make to establish that administrative
> remedies were not "available" within the meaning of the Prison
> Litigation Reform Act ("PLRA"); (2) whether the PLRA's exhaustion
> requirement is satisfied where a prison administrator elects to resolve a
> procedurally improper administrative request on the merits; and (3)
> whether a prison's housing and cellmate assignments meet the
> discretionary function exception to the [FTCA's] limited waiver of
> sovereign immunity.

*Id.* The Third Circuit vacated the dismissal of Rinaldi's First Amendment retaliation

claim and directed this Court to consider whether Rinaldi was subjectively deterred

from exhausting his administrative remedies with respect to that claim. *Id.* at 270. The

Third Circuit further concluded that Rinaldi had exhausted his Eighth Amendment

failure to protect claim and therefore vacated this Court's dismissal of that claim. *Id.*

at 273. Finally, the Third Circuit affirmed this Court's judgment in all other respects,

including the dismissal of Rinaldi's FTCA claim. *Id.* at 272-74.

On November 28, 2018, this Court entered an Order, pursuant to *Paladino v.

Newsome*, 885 F.3d 203 (3d Cir. 2018), directing Defendants to file a supplemental

brief, within twenty-one (21) days, "address[ing] the remanded issue of whether

[Rinaldi] was subjectively deterred from lodging a grievance or pursuing the grievance

process that [Rinaldi] failed to exhaust related to his First Amendment retaliation claim

and present materials pertinent to the issue." (Doc. No. 60 at 2.) The Court stayed "Defendants' pleading or other response to [Rinaldi's] exhausted Eighth Amendment assault claim . . . pending resolution of the First Amendment retaliation administrative remedy exhaustion issue." (*Id.*) On December 18, 2018, Defendants filed a motion to modify court order and for enlargement of time (Doc. No. 61) and brief in support (Doc. No. 62). Specifically, Defendants asked the Court to modify its Order "to require briefing of the threshold issue of whether a *Bivens* remedy extends to First Amendment retaliation claims by federal inmates based on an intervening change in the law due to the recent Supreme Court decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), and whether defendants are entitled to qualified immunity even if a remedy is appropriate under *Bivens*." (Doc. No. 62 at 2.) In an Order entered on February 6, 2019, Magistrate Judge Carlson directed Defendants to file a single, comprehensive motion for summary judgment, brief, and statement of facts on or before March 6, 2019. (Doc. No. 64.) Defendants filed a motion to dismiss and/or for summary judgment on March 11, 2019. (Doc. No. 68.)

In a Memorandum and Order dated April 19, 2019, the Court granted in part and denied in part Defendants' motion. (Doc. Nos. 76, 77.) The Court: (1) granted the motion with respect to Rinaldi's First Amendment retaliation claim; (2) granted the motion with respect to Rinaldi's Eighth Amendment claim against Defendants

Watts, Norwood, Bledsoe, Thomas, Grondolsky, Young, Rear, Doe, and Taggart; and (3) denied the motion with respect to Rinaldi's Eighth Amendment claim against Defendants Kissell, Baysore, and Gee. (Doc. No. 77.) The Court also issued a scheduling order, directing the parties to complete fact discovery by October 16, 2019 and file any dispositive motions by October 30, 2019. (Doc. No. 79.)

Subsequently, Rinaldi filed a motion to amend his complaint. (Doc. No. 88.) In a Memorandum and Order dated November 26, 2019, the Court granted in part and denied in part his motion. (Doc. Nos. 93, 94.) Specifically, the Court: (1) granted the motion with respect to Rinaldi's proposed addition of Beaver and Raup as Defendants; and (2) denied the motion with respect to Rinaldi's proposed addition of John Doe as a Defendant. (Doc. No. 94.) The Court noted that this matter would proceed as to Rinaldi's failure to protect claim against Defendants Baysore, Kissell, Gee, Beaver, and Raup. (*Id.*) The parties subsequently completed discovery, and Defendants' motion for summary judgment followed.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific

material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the

statement required to be served by the moving party will be deemed to be admitted."

L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant.  These rules apply with equal force to all parties.  *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III.    PLAINTIFF'S OBJECTIONS

Rinaldi has filed objections to Defendants' motion for summary judgment, arguing that the Court should not rely upon several exhibits submitted by Defendants because they were not provided to him as part of discovery.  (Doc. No. 134 at 1.) He maintains that Defendants never answered the interrogatories that he posed to Defendants Raup and Beaver.  (*Id.*)  In response, Defendants aver that, "excepting those exhibits which are the subject of the Court's April 1, 2021 sealing order, any other exhibits not previously disclosed during discovery were not requested by [Rinaldi] in any properly served discovery request."   (Doc. No. 138 at 4.) Defendants also maintain that counsel never received any interrogatories posed to Defendants Raup and Beaver.  (*Id.* at 4-5.)

Defendants have also construed Rinaldi's objections to be a motion pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. When a party opposing a motion for summary judgment shows that it "cannot present facts essential to justify its opposition," the Court may grant additional time for discovery. *See* Fed. R. Civ. P. 56(d). "If discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law." *In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749, 761 (3d Cir. 2019) (quoting *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015)). Rinaldi, however, never moved for an extension of the discovery period, nor has he filed a declaration pursuant to Rule 56(d) explaining why discovery is necessary. *See Shelton*, 775 F.3d at 565-66 (noting that "Rule 56(d) states that '[i]f a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order"). Given Rinaldi's failure to properly request discovery from Defendants during the discovery period, the Court will reject Plaintiff's objections to Defendants' reliance on certain exhibits in support of their motion for summary judgment.

## IV.    STATEMENT OF MATERIAL FACTS[1]

At the time of the incidents, Rinaldi was serving a 240-month sentence imposed by this Court on November 3, 1999. (Doc. No. 131 ¶ 1.)  Rinaldi had been convicted of: "(a) violations of conspiracy to distribute and possession with intent to distribute cocaine; (2) aiding and abetting in the distribution and possession with intent to distribute cocaine; (3) possession of a firearm during a drug trafficking crim[e]; and (4) felon in possession of a firearm."  (*Id.*)

### A.    Facts Regarding the Special Management Unit ("SMU") at USP Lewisburg

The SMU program at USP Lewisburg "was designed for inmates who present unique security and management concerns where enhanced management is necessary to ensure the safe, secure, and orderly operation of BOP facilities and

---

[1] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements.  *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  *See id.*  Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statement of material facts.  (Doc. No. 131.)  While Plaintiff did file "objections" to Defendants' statement of facts (Doc. No. 133), this document is not a response to Defendants' statement of facts that complies with Local Rule 56.1.  Plaintiff merely disagrees with a few paragraphs and fails to cite to any evidence to support his denial of such.  Accordingly, unless otherwise noted, the Court deems the facts set forth by Defendants to be undisputed.  *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1; *United States v. Alberto*, No. 3:18-cv-1014, 2020 WL 730316, at *2 (M.D. Pa. Feb. 13, 2020) (concluding that the "[f]ailure to file this [responsive statement of material facts] results in admission of the moving party's statement of facts").

protection of the public." (*Id.* ¶ 2.) A sentenced inmate may be designated to a SMU if he meets any of the following criteria: (1) participation in "disruptive geographical group/gang-related activity"; (2) having a leadership role in "disruptive geographical group/gang-related activity"; (3) having a history of "serious or disruptive disciplinary infractions"; (4) committing any 100-level prohibited act after being classified as a member of a disruptive group; (5) participating in, organizing, or facilitating "any group misconduct that adversely affected the orderly operation of a correctional facility"; and (6) participating in or associating with activity such that greater management is needed. (*Id.* ¶ 3.) Rinaldi was designated to the SMU program at USP Lewisburg on November 21, 2011. (*Id.* ¶ 4.)

**B.**    **Facts Regarding Central Inmate Monitoring ("CIM")— Separations**

The BOP "monitors and controls the transfer, temporary release and community activities of inmates who present special needs for management, known as [CIM] cases." (*Id.* ¶ 5.) These cases require a higher level of review. (*Id.* ¶ 6.) The BOP monitors these cases "to provide protection to all concerned and to contribute to the safe and orderly operation of the federal prison institutions." (*Id.* ¶ 7.) "The Case Management Coordinator is responsible for the oversight and coordination of CIM activities at the institution level." (*Id.* ¶ 8.) "CIM categories include 'separation' which include inmates who may not be confined in the same

11

institution (unless the institution has the ability to prevent any physical contact between the separatees)." (*Id.* ¶ 9.) Factors that must be considered include "testimony by or about an individual in court, and whether the inmates has exhibited aggressive or intimidating behavior towards other specific individuals in the community or institution." (*Id.* ¶ 10.) CIM Clearance and Separation Data for Rinaldi indicates that "inmate Pink was not a designated separate for Rinaldi as of February 2, 2012, or at any time thereafter." (*Id.* ¶ 11.) Likewise, CIM Clearance and Separation Data for "Altrazo Pink [indicates] that Rinaldi was not a designated separatee for Pink as of February 2, 2012, or at any time thereafter." (*Id.* ¶ 12.)

### C.   Facts Regarding SMU Housing and Cell Assignments at USP Lewisburg

In 2011 and 2012, inmate cell assignments for the SMU at USP Lewisburg "were the responsibility of the Unit Team with direct oversight by the Unit Manager." (*Id.* ¶ 13.) Inmates in the SMU were typically assigned to cells with two (2) occupants. (*Id.* ¶ 14.) "A Unit Manager supervises the primary Unit Team members, which include a Case Manager, Correctional Counselor[,] and Unit Secretary." (*Id.* ¶ 15.) Single cell assignments were generally not permitted because the "purpose of the program was to have inmates with a history of disruptive behavior to learn to coexist peacefully with other inmates." (*Id.* ¶ 16.)

Cell and housing unit assignments "are continually subject to change to meet the unpredictable housing demands and institution population levels while accounting for the safety, security, and orderly running of a SMU." (*Id.* ¶ 17.) "At minimum, there are regular 21-day cell rotations." (*Id.* ¶ 18.) Inmates are screened for compatibility before assignments are made. (*Id.* ¶ 19.) When making cell assignments, "Unit Team and Correctional Services consideration includes, but is not limited to, CIMS separations, Security Threat Group assignments, offense history, institution adjustment, staff's ability to control the inmate's interactions within the SMU program, and the goal of redesignating the inmate to the general population after SMU program completion." (*Id.* ¶ 20.) "It was not uncommon for inmates in the SMU to make unverified threats about accepting cellmates to attempt to manipulate a single cell assignment." (*Id.* ¶ 21.) Rinaldi "testified that inmates at USP Lewisburg were refusing cellmates due to compatibility issues and being in the cell for 23 hours per day." (*Id.* ¶ 22.)

### D.   Facts Regarding Rinaldi's Claim

On January 29, 2012, Rinaldi submitted Informal Resolution Attempt 12-021, asking that USP Lewisburg stop double celling because he was assaulted by a previous cellmate and suffered "from a mild case of paranoia." (*Id.* ¶ 23.) Defendant Baysore responded on February 1, 2012, and denied Rinaldi's request. (*Id.* ¶ 24.)

13

"[T]he BOP's record of [Rinaldi's] administrative remedy submissions reveals that between his arrival at USP Lewisburg on November 21, 2011 and February 2, 2012, he filed only nine administrative remedies."  (*Id.* ¶ 25.)

Rinaldi "testified that aside from the issue of [his] filing administrative remedies, he had no other issues with Defendant Baysore."  (*Id.* ¶ 26.)  He stated that "the cells in Z Block were more desirable to the cells in D Block because the cells are larger and there is a shower inside the cell, so inmates did not have to wait to be taken to a shower outside the cell."  (*Id.* ¶ 27.)  "Defendant Gee came to [Rinaldi's] cell on February 2, 2012, to tell him he would be moved to D Block different cell, but he does not recall which staff members escorted him from Cell Z-102 to Cell D-218."  (*Id.* ¶ 28.)  He could not recall whether "the staff members who escorted him from Cell Z-102 turned him over to other staff members upon their arrival to D Block, or if they escorted him all the way to Cell D-218."  (*Id.* ¶ 29.)  Rinaldi "does not know which officers were present when he arrived at Cell D-218," but inmate Altrazo Pink was in the cell when he arrived.  (*Id.* ¶¶ 30-31.)

Inmate Pink asked Rinaldi where he was from, and Rinaldi replied that he was from Philadelphia.  (*Id.* ¶ 33.)  "On February 2, 2012, at approximately 12:17 p.m. in Cell D-218, Defendant Beaver attempted to place hand restraints on inmate Altrazo Pink in order to safely place Rinaldi in the cell."  (*Id.* ¶ 34.)  When Defendant

Beaver opened the food slot, inmate Pink "refused to submit to restraints and stated 'I am not cuffing up and if you put anybody in here with me I will kill them and hurt the officer trying to do it.'" (*Id.* ¶ 35.)

Defendant Beaver prepared an incident report "for inmate Pink after reasonably believing he violated Code 203, Threatening another with bodily harm or any offense, Code 307, Refusing to Obey an Order, and Code 298, Interfering with a Staff Member in the Performance of his Duties." (*Id.* ¶ 36.) On February 2, 2012, at approximately 12:55 p.m., Defendant Raup informed Pink of the charges, provided him a copy of the incident report, noted that he had a right to remain silent, and gave him an opportunity to make a statement. (*Id.* ¶ 37.) Defendant Raup subsequently forwarded the incident report to the Unit Disciplinary Committee ("UDC"). (*Id.* ¶ 38.)

Defendants Beaver and Raup did not know of any "information, intelligence, CIMS separation concerns, or specified threat[] indicating Altrazo Pink and Rinaldi were incompatible as cellmates." (*Id.* ¶ 39.) Neither of them "had a role in determining which block Rinaldi was to be housed on," and they had no role in his cell assignment. (*Id.* ¶¶ 40-41.) Neither of them "participated in any conversation about the decision to house Rinaldi and Pink together after the aforementioned February 2, 2012, statement by Pink." (*Id.* ¶ 42.) Rinaldi "is unaware of any

conversations between either Defendant Beaver or Defendant Raup with Defendant Baysore about him before February 2, 2012." (*Id.* ¶ 43.) He "does not recall have any encounters with Defendants Baysore, Gee, or Kissell after February 2, 2012." (*Id.* ¶ 44.) Moreover, while he may have had interactions with Defendants Beaver and Raup after that time, he does not remember them. (*Id.* ¶ 45.)

On February 2, 2012, "the Acting Warden authorized a calculated use of force team to be assembled to remove Pink from the cell and to place him in ambulatory restraints due to his disruptive behavior." (*Id.* ¶ 48.) Rinaldi was "locked in a shower while staff members removed Pink from Cell D-218." (*Id.* ¶ 49.) Pink submitted to restraints and was moved to D-Block, Cell 102. (*Id.* ¶ 50.) When staff members "placed Rinaldi into Cell D-218, Pink was no longer there." (*Id.* ¶ 51.) A lieutenant subsequently "discontinued the ambulatory restraints because they had achieved the 'desired calming effect'" on inmate Pink. (*Id.* ¶ 55.) "Staff members escorted Pink back to Cell D-218 after his release from restraints on February 2, 2012, but Rinaldi cannot identify those staff members." (*Id.* ¶ 56.) When Pink returned to the cell, "he objected to moving into the cell, but made no threats toward Rinaldi." (*Id.* ¶ 57.) On February 6, 2012, the UDC referred the incident report to a Disciplinary Hearing Officer ("DHO") for further proceedings. (*Id.* ¶ 58.) Inmate Pink "requested that

Defendant Kissell serve as his staff representative and that three inmates, including Rinaldi, testify on his behalf." (*Id.* ¶ 59.)

Rinaldi and Pink shared the cell from February 2, 2012, until February 12, 2012 without incident. (*Id.* ¶ 60.) Rinaldi and Pink then "moved to D-Block Cell 217 where they remained housed together without incident until February 23, 2012." (*Id.* ¶ 61.) Inmate Pink "was 57 years old when he and Rinaldi were cellmates; Rinaldi was only 35 years old—22 years younger than Pink." (*Id.* ¶ 62.)

On February 7, 2012, Rinaldi submitted Administrative Remedy 675165-F1, asking that USP Lewisburg discontinue double celling and referencing a prior assault by a cellmate. (*Id.* ¶ 63.) On February 14, 2012, the Warden responded and denied Rinaldi's request. (*Id.* ¶ 64.) On March 18, 2012, at Pink's DHO hearing, "Defendant Kissell testified that Pink asked him to arrange for Rinaldi to appear as a witness to refute the charges lodged against him." (*Id.* ¶ 65.) Pink testified "that when staff members brought Rinaldi to the cell door, he refused to take him in the cell, but did not threaten him." (*Id.* ¶ 66.) "Rinaldi appeared at the hearing on March 18, 2012 and testified, 'All Pink did was refused to let me in the cell. Pink was just expressing that he was in fear because he had been assaulted by a prior cellmate.'" (*Id.* ¶ 67.) The DHO "ultimately found Pink committed the prohibited act of threatening, in violation of Code 203." (*Id.* ¶ 68.) Rinaldi remained at USP

17

Lewisburg until November 7, 2012; he "never filed an administrative remedy asserting that inmate Pink assaulted him while they were cellmates." (*Id.* ¶¶ 69-70.)

When Rinaldi and Pink were cellmates between February 2-23, 2012, "there [were] no reported or observed physical incidents between the two." (*Id.* ¶ 71.) Neither reported any injury, and no injuries were observed, during this time. (*Id.* ¶ 72.) On January 31, 2012, Rinaldi was "seen by a Physician Assistant at his cell for a sick call visit after submitting a written request (copout) for a complaint of nondescript chest pain that occurred when laying on his left side and of a lump on his forehead." (*Id.* ¶ 73.) In 2012, "Rinaldi was also seen by Health Services Staff for complaints of chest pain, headache and vomiting and a blood pressure concern, but Rinaldi never presented with concerns about injuries or being assaulted by his cellmate." (*Id.* ¶ 74.) "Likewise, between February 2, 2012 to February 23, 2012, Pink had no encounters with Health Services resulting from fighting with his cellmate." (*Id.* ¶ 75.)

## V. DISCUSSION

Defendants assert that they are entitled to summary judgment because: (1) special factors "counsel hesitation for this Court to engage in the 'now disfavored judicial activity' of extending *Bivens* to the new context of Rinaldi's Eighth Amendment claims based on his cell assignment"; (2) Rinaldi's Eighth Amendment

claim lacks merit; (3) Rinaldi's injury was not more than *de minimis* as required by 42 U.S.C. § 1997e(e); and (4) Defendants Gee, Beaver, and Raup are entitled to qualified immunity. (Doc. No. 132 at 14.)

## A. Availability of *Bivens*

In 1971, the Supreme Court concluded that, even absent statutory authorization, it would enforce a damages remedy allowing individuals to be compensated after experiencing violations of the prohibition against unreasonable searches and seizures contained in the Fourth Amendment. *See Bivens*, 403 U.S. at 397. Subsequently, the Court extended the *Bivens* cause of action in two cases involving constitutional violations. First, in *Davis v. Passman*, 442 U.S. 228, 249-49 (1979), the Court concluded that the Fifth Amendment's Due Process Clause provided a damages remedy to an administrative assistant claiming that a Congressman had discriminated against her on the basis of gender. Next, the Court concluded that the Eighth Amendment's prohibition on cruel and unusual punishment provided a prisoner a cause of action for damages against prison officials who failed to treat his asthma. *See Carlson v. Green*, 446 U.S. 14, 19 (1980). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). Over the years that followed,

the Supreme Court has "consistently refused to expand *Bivens* actions beyond these three specific contexts." *See Mack v. Yost*, 968 F.3d 311, 318 (3d Cir. 2020).

In *Ziglar*, the Supreme Court noted that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *See Ziglar*, 137 S. Ct. at 1857. As the Court stated in *Ziglar*:

> If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*See id.* at 1859-60. If the case presents a new context, a court must then consider whether any alternative remedies exist. *See id.* Even absent alternative remedies, a court must also consider whether special factors counsel against extending the *Bivens* remedy. *See id.*

Two (2) years ago, in its April 16, 2019 Memorandum, this Court concluded that *Bivens* extended to Rinaldi's Eighth Amendment failure to protect claim. *Rinaldi v. United States*, No. 1:13-cv-450, 2019 WL 1620340, at *12-14 (M.D. Pa. Apr. 16, 2019). In doing so, the Court noted that the Third Circuit had recently

20

concluded that a pretrial detainee could bring a failure to protect claim under the Fifth Amendment pursuant to *Bivens*. *Id.* at \*12 (citing *Bistrian v. Levi*, 912 F.3d 79, 90 (3d Cir. 2018)). The Court noted:

> In holding that Bistrian could bring such a claim under *Bivens*, the Third Circuit noted that the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 . . . (1994), was "of greatest significance." *Bistrian*, 912 F.3d at 90. In *Farmer*, "the Court assessed a 'failure to protect' claim brought under the Eighth Amendment and *Bivens* as a result of prisoner-on-prisoner violence." *Id.* (citing *Farmer*, 511 U.S. at 829-34 . . .). The Third Circuit recognized that [the] *Farmer* Court did not "explicitly state that it was recognizing a *Bivens* claim," but that it "not only vacated the grant of summary judgment in favor of the prison officials but also discussed at length 'deliberate indifference' as the legal standard to assess a *Bivens* claim, the standard by which all subsequent prisoner safety claims have been assessed." *Id.* (citing *Farmer*, 511 U.S. at 832-49 . . .). The panel noted that "[t]he prisoner-on-prisoner violence is not a new context for *Bivens* claims," *id.* at 88, and declined to conclude that the fact that the Court did not cite *Farmer* in *Ziglar* meant that *Farmer* had been overruled by implication, *id.* at 91 (quoting *Agostini v. Felton*, 521 U.S. 203, 237 . . . (1997)).

*Id.* The Court also noted that the District of New Jersey had recently concluded that *Bivens* extended to a federal inmate's Eighth Amendment claim that officials failed to protect him from "another inmate who 'had a known propensity for assaulting other inmates and entering housing units.'" *Id.* at \*13 (quoting *Doty v. Hollingsworth*, No. 15-3016 (NLH), 2018 WL 1509082, at \*1 (D.N.J. Mar. 27, 2018)).

Defendants now assert that "[n]o *Bivens* remedy extends to Eighth Amendment claims involving inmate cell assignments and special factors support declining to recognize one under the circumstances of this case." (Doc. No. 132 at 15.) Defendants argue that Rinaldi's "dispute is with his cell assignment" and that his "claims arise in the context of inmate housing decisions and institutional safety." (*Id.* at 19.) Rinaldi asserts that "this exact same argument was raised by the defendants and this Court already addressed the issue." (Doc. No. 135 at 1-2.) He argues that their motion for summary judgment is "not an appropriate vehicle in order to try and have this Court reconsider its earlier decision." (*Id.* at 2.) Defendants assert that this motion "is brought after additional discovery and further development of case law as well as on behalf of two newly added defendants whose roles were not before the Court at the time of its previous decision." (Doc. No. 138 at 6.)

Upon consideration of the record, the Court disagrees with Defendants that Rinaldi's claim can be simply classified as a dispute with his cell assignment. In *Bistrian*, the Third Circuit noted that "prisoner-on-prisoner violence is not a new context for *Bivens* claims, and no special factors counsel against allowing a failure-to-protect cause of action." *Bistrian*, 912 F.3d at 88. Here, Rinaldi's failure to protect claim is based upon his allegations that: (1) Defendant Baysore threatened to

move him to a cell with another inmate known for assaulting others, (2) he was moved to such a cell; (3) inmate Pink threatened to kill him if officers placed him in the cell; and (4) he and inmate Pink engaged in altercations while they were housed together. Thus, while Rinaldi's failure to protect claim arises from his cell assignment, he asserts that Defendants assigned him to a cell with an inmate known for assaulting his cellmates. Courts within the Third Circuit have noted that, after *Bistrian*, *Bivens* extends to failure to protect claims under the Eighth and Fifth Amendments. *See, e.g.*, *Gambino v. Cassano*, No. 17-0830, 2021 WL 1186794, at *5 (D.N.J. Mar. 30, 2021); *Straker v. Valencik*, No. 3:18-cv-1569, 2021 WL 1134591, at *4 (M.D. Pa. Mar. 24, 2021). The Court, therefore, declines to reconsider its previous ruling and maintains that *Bivens* extends to Rinaldi's Eighth Amendment failure to protect claim.

### B. Merits of Rinaldi's Eighth Amendment Claim

The Eighth Amendment requires prison officials to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). While prison officials have the duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another equates to constitutional liability for the officials responsible for that inmate's safety. *Id.* at 833-34. Rather, an inmate raising a failure to protect

claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837). This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Id.*; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). Actual knowledge may be proven circumstantially in situations where the general danger was obvious. *Farmer*, 511 U.S. at 842. For example, if the prisoner

> presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Id.* at 842-43. However, "a defendant can rebut a *prima facie* demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Beers-Capitol*, 245 F.3d at 133.

In his verified complaint, Rinaldi avers that on February 2, 2012, he "was moved to D block and placed in a cell with an inmate who informed the officers that if Rinaldi were placed in the cell he would kill Rinaldi." (Doc. No. 1 ¶ 28.) He maintains that for approximately three (3) week after, he and his cellmate engaged in a number of altercations, from which he "suffered cuts and bruises and emotional distress." (*Id.* ¶ 29.) According to Rinaldi, Defendant Beaver overheard inmate Pink threaten him and issued an incident report to inmate Pink. (Doc. No. 1-1 at 2.) The incident report was read to inmate Pink by Defendant Raup. (*Id.* at 2-3.)

Upon consideration of the record before it, the Court concludes that there is no evidence from which a reasonable factfinder could conclude that Defendants were aware that inmate Pink posed a serious risk of harm to Rinaldi prior to placing Rinaldi in a cell with inmate Pink on February 2, 2012. As noted *supra*, the SMU is designed to address security and management concerns for inmates who have a history of gang-related activities, serious disciplinary infractions, or organizing group misconduct. (Doc. No. 131 ¶¶ 2-4.) Inmates assigned to the SMU at USP Lewisburg were assigned cellmates because part of the purpose of the SMU program was to have inmates with a history of disruptive behavior learn to coexist peacefully with other inmates." (*Id.* ¶¶ 14-16.) Staff members were aware of inmates assigned to the SMU making unverified threats about accepting cellmates to manipulate a

25

single cell assignment. (*Id.* ¶ 21.) Moreover, Rinaldi testified that inmates tried to refuse cellmates because of compatibility issues and being in the cell for 23 hours per day. (*Id.* ¶ 22.)

During his deposition, Rinaldi testified that he had never met inmate Pink prior to February 2, 2012. (Doc. No. 131-6 at 6.) Moreover, Rinaldi and inmate Pink have never been designated as CIM separatees for one another. (Doc. No. 131 ¶¶ 11-12.) Overall, there is no evidence before the Court that inmate Pink had a history of violence or a known reputation of assaulting Rinaldi. *See Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012) (noting that the risk that "an inmate with a history of violence might attack another inmate for an unknown reason" is too speculative to maintain a failure to protect claim against prison officials), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020). Nothing in the record before the Court could lead a factfinder to conclude that there was "longstanding, pervasive, well-documented, or previously noted tensions between" inmate Pink and Rinaldi. *See Bozochovic v. Verano*, No. 1:17-cv-1439, 2019 WL 929089, at *3 (M.D. Pa. Feb. 26, 2019) (quoting *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014)).

Moreover, nothing in the record creates a genuine issue of material fact as to whether Defendants knew inmate Pink presented a serious risk of harm to Rinaldi

and deliberately ignored that risk. Rinaldi avers that Defendant Baysore told him that "if he continued to file administrative remedies that she would have him moved to a different unit and placed in a cell with an inmate who is known for assaulting his inmates." (Doc. No. 1 ¶ 25.) Rinaldi reported this threat to Defendant Kissell, who "said he wasn't going to get involved in what is going on because it is over his head and they are tired of Rinaldi filing administrative remedies." (*Id.* ¶ 26.) Defendant Gee informed Rinaldi that he was being moved to D Block on February 2, 2012. (*Id.* ¶ 27.) As noted *supra*, however, Rinaldi had never met inmate Pink before February 2, 2012, and they were never CIM separatees. Likewise, the risk that inmate Pink may have had a history of violence and "might attack another inmate for an unknown reason" is too speculative for Rinaldi to maintain his failure to protect claim against Defendants Baysore, Kissell, and Gee. *Bistrian*, 696 F.3d at 371. Moreover, as a corrections officer, Defendant Gee had no role in Rinaldi's cell assignment. (Doc. No. 131 ¶¶ 13-15.) Rinaldi testified that while Defendant Gee informed him that he would be moved to D Block, he could not recall whether Defendant Gee escorted him from Z Block to D Block. (Doc. No. 131-5.) Overall, nothing in the record would lead a reasonable factfinder to conclude that Defendants Baysore, Kissell, and Gee were aware that inmate Pink posed a risk of harm to

Rinaldi's safety and deliberately ignored that risk. Accordingly, they are entitled to summary judgment with respect to Rinaldi's Eighth Amendment claim.

Moreover, the record reflects that Defendants Beaver and Raup responded reasonably to any threat made by inmate Pink on February 2, 2012. Rather, the record reflects that when Defendant Beaver attempted to place hand restraints on inmate Pink to place Rinaldi in the cell, inmate Pink stated, "I am not cuffing up and if you put anybody in here with me I will kill them and hurt the officer trying to do it." (Doc. No. 131-3 at 2.) Based on this statement, Defendant Beaver prepared an incident report charging inmate Pink with violating Code 203 (threatening another with bodily harm), Code 307 (refusing to obey an order), and Code 298 (interfering with a staff member in the performance of his duties). (*Id.*) Defendant Raup informed inmate Pink of the incident report and forwarded it to the UDC. (Doc. No. 131-4 at 2-3.) Moreover, after inmate Pink made the threat, staff members placed Rinaldi in a nearby shower and placed inmate Pink in ambulatory restraints before removing him from the cell. (Doc. No. 131 ¶¶ 49, 52-56.) Rinaldi testified that when inmate Pink was returned to the cell, he objected to moving into the cell but did not make any threats toward Rinaldi. (Doc. No. 131-6 at 9.) However, Rinaldi was "not sure" who the officers were who escorted inmate Pink to the cell. (*Id.*) Notably, the record also reflects that Rinaldi testified on behalf of inmate Pink during

his disciplinary hearing.  Rinaldi testified, "All Pink did was refuse to let me in the cell.  Pink was just expressing that he was in fear because he had been assaulted by prior cellmates."  (Doc. No. 126 at 3.)

In his brief in opposition, Rinaldi suggests that Defendants Beaver and Raup did not act reasonably.  (Doc. No. 135 at 3.)  He suggests that a "reasonable response would have been an attempt to keep Pink and Rinaldi [separate] due to the threat. Yet they were forced to cell together instead."  (*Id.*)  However, the record establishes that during the relevant time, cell assignments at USP Lewisburg were made by the Unit Team, which consisted of a case manager, correctional counselor, and unit secretary, not correctional officers and lieutenants.  (Doc. No. 131 ¶¶ 13, 15.)  Thus, Defendants Beaver and Raup were not involved in Rinaldi's cell assignment. Moreover, they reported inmate Pink's threat to the Acting Warden.  (*Id.* ¶ 48.) Moreover, contrary to Rinaldi's conclusory assertion that he and inmate Pink engaged in a "number of altercations" from which he suffered "cuts and bruises and emotional distress" (Doc. No. 1 ¶ 29), medical records establish that he "never presented [to the medical department] with concerns or injuries related to being assaulted by his cell mate in February, 2012."  (Doc. No. 131-7 at 3.)

The Third Circuit has concluded that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted." *Bistrian*, 696 F.3d at 367 (quoting *Farmer*, 511 U.S. at 844). Rinaldi has presented no evidence creating a genuine issue of material fact as to whether Defendants Beaver and Raup acted reasonably when inmate Pink made a verbal threat to harm Rinaldi. From the record before the Court, a reasonable factfinder would conclude that Defendants Beaver and Raup acted reasonably by removing inmate Pink from the cell, issuing the incident report, and placing him back in the after he had calmed down and Rinaldi was already inside. The Court, therefore, will grant summary judgment to Defendants Beaver and Raup with respect to Rinaldi's Eighth Amendment claim.[2]

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 116) will be granted. An appropriate Order follows.

s/ Sylvia H. Rambo
United States District Judge

Date: May 25, 2021

---

[2] Given the conclusion that Plaintiff cannot maintain meritorious Eighth Amendment failure to protect claims against Defendants, the Court declines to consider Defendants' arguments regarding 42 U.S.C. § 1997e(e) and that Defendants Gee, Beaver, and Raup are entitled to qualified immunity.